Good morning, Your Honors. I am Timothy Kahn on behalf of Petitioner and Appellant Arnold Laxson. Your Honors, the immigration judge who heard Mr. Laxson's asylum appeal made a series of clearly erroneous assumptions of fact. These errors of fact were prejudicial to the hearing, deprived Mr. Laxson of a constitutionally fair hearing, and alone required reversal and remand for a new hearing. This is what the immigration judge said near the beginning of his ruling after the presentation of the asylum claim. Quote, this is from page 97 and 98 of the appellate record. The respondent, that is Mr. Laxson, filed an application for asylum which contained a detailed statement of his claim. He hired a new counsel after his claim for asylum was rejected and filed a second declaration in support of his claim. And in one sense, perhaps most importantly, when the respondent submitted the application and later at the interview, because it is standard practice at asylum interviews, the respondent again swore under oath that the application was true, that it was accurate, that it was complete, and that he was familiar with the contents of it. Your Honors, none of this ever happened. We don't know why the immigration judge believed that there had been a prior asylum hearing that at which Mr. Laxson reaffirmed his 1994 declaration. Well, is that a reference to the asylum interview, to the asylum officer, not to an asylum hearing per se? I mean, that's how I read it.  Which everybody, they wouldn't get in front of the I.J. unless they hadn't succeeded on round one. Asylum officer. There are two different ways to be awarded asylum. One is affirmatively through an asylum officer administrative process. Mr. Laxson started that process. Correct. But he was never, it was never, came to a conclusion. And so because of various circumstances, or beyond his control, he did not, his attorney did not appear for the final interview, and so there was no ruling, decision by the asylum officer. Did he ever appear in front of the asylum officer? No. He never appeared in front. I think early on he showed up for one of the hearings and the asylum officer wasn't available. There was a series of three or four scheduled hearings. But he submitted an affidavit. I'm sorry? He submitted his declaration. Yes. He submitted his declaration in 1994 as part of the I-589. He was aided in the preparation of that declaration by a friend and an attorney. There's some confusion in the record about whether there's any evidence that this original attorney helped him with his application. We do have some corroborating evidence. Well, somebody helped him because it's in pretty clear English. Yes. And I think at page 938 of the record there is the attorney appearance of the Mr. Roundtree. Mr. Roundtree is somebody we tried to locate eight years ago and were not able to. But the prejudice from the judge who's observing Mr. Lackson during his 2004 hearing and hearing the story and weighing his credibility from having believed that it had already been rejected and then changed after the rejection rather than what Mr. Lackson testified, which was what he voluntarily offered, yeah, looking at these facts, these dates, some of the details that I submitted 10 years ago, some of them are wrong. He voluntarily came to the court with that correction. However, in the judge's mind, he'd only made that correction after he presented eight years later that original story and had it rejected. That's a significant material type of prejudice. In fact, what do you – explain to me what was the – why did he change – why did he make the changes in his second declaration? Yes. The changes – because in going over the first declaration that he'd prepared, some of the dates were wrong. And they were obviously wrong. One of the dates was 1993. One of the events was – should have been in 86, was 93, the year after he'd gotten to the United States. I mean, there was sort of some obvious misrecording or translating of the dates. The coherence, material portions of the story are the same all the way through. The immigration judge tried to pick out a couple. What he found were substantive contradictions. And they – and, frankly, for example, the judge thought that Mr. Laxman should have volunteered that the organization that he was a part of was, in the view of some political professors, a Marxist organization. But if you look at that testimony clearly, it's – it doesn't show a lack of credibility at all. And if I may, may I read that testimony for you? The judge asked Mr. Laxman, what was the political ideology of the KM organization? Mr. Laxman, we are support, spy, informer, the new people's army. That's what the KM believed in, asked the judge. No, no, that was what the government believed about the KM. I want to know what was the actual political ideology or political point of view of the KM, not what the government thought they were doing. We spoke out about children's education, health care, jobs, the agriculture, land reform, all kind of freedoms for the Philippines' citizens, the judge asked. Was there a particular political philosophy? Yes. We always speak against the government's corruption. This exchange doesn't show evasiveness, doesn't show any attempt to lie. It shows plain-spoken English language by someone who doesn't speak English as a first language, describing actually fairly accurately, if you compare the public sources, what the KM was about. By the way, I want to make sure I reserve one minute for rebuttal. All right. I see I've got three, so. Let me – when it got to the board, the board said, well, they looked at everything the Maybe not each one of these adverse credibility reasons, the reasons that I.J. gave. Individually, they don't – they wouldn't cut it. But when you look at all of them together, as they use the term constellation, you know, we think that the I.J.'s decision was supported by the evidence. What do we do with that? Yeah. I don't think the constellation metaphor works here, because if you look at all of them individually, there's something wrong with all of them. But most fundamentally, the entire hearing was tainted by this predisposition of the judge that was clearly wrong, clearly erroneous. This Court's Mutuku decision says clearly erroneous findings of fact on which an adverse credibility decision are premised must be reversed. But what – let's take something more specific. What about Orlando's body? Yes or no? Was it found or was it not found? Was it on the side of the road or did it never appear? That's pretty concrete. The testimony, I think, if you line it up, is pretty clear. His body was never found. He was originally told – all this is what is being heard in the Philippines from other KM members who heard something. You know, it's – and what he heard was the body was deposited along some highway in Panay. Now the body was – and the body ultimately never was recovered. Those aren't inconsistent. In fact, consistent with a lot of information in the public record about disappearances. I mean, we put in a lot of that source material. The story that Mr. Lackson tells about his brother Nelson and about his brother Melbourne is consistent with what we – He would never – you know, he was promising to produce the death certificate. Was there ever a death certificate if it was never found? Of course not. Of course there was never a death certificate. No, but you see, that's where we're weaving in and out. Was it found? Was it recovered? There's something there, I think, that gave the immigration judge considerable pause about, well, what really happened? Why can't you tell a single story on something that's not as precise as a date, for example? And so I still haven't quite understood from you why this isn't a significant inconsistency. Maybe you could just run that by me again. Why the Orlando story is not an inconsistency. I think there was a statement in the 1994 declaration, our I-589 application, that if they found the death certificate, they would bring it. So at that point, maybe there was still some hope that they might find the body. But Arnold's testimony is always – Mr. Lackson's, excuse me, testimony has always been consistent. The body was never found. The body was never found. Yes, he was told originally, you know, in the stories that were circulating about these disappearances, that there – that a general location where the body had been executed and deposited. But I don't think there's anything in the record, at least in Mr. Lackson's mouth, saying the body was found, no, the body wasn't found. All right. We'll hear from the government. I'll give you a minute for rebuttal. Thank you. Good morning, and may it please the Court. My name is Greg Mack, counsel for the Respondent, the Attorney General of the United  States. The petitioner must do more than offer explanations to this Court for the inconsistencies and the contradictions in his evidence before the immigration judge. Rather, he must demonstrate that the record evidence compels a contrary conclusion, that this record evidence unerringly points away from what the immigration judge and the Board decided in this case. He can't do this in this petition for review because of the problem that the judge pointed out with respect to the circumstances surrounding Orlando's body and whether his body was ever found and when. What's inconsistent about that? What's inconsistent about it is. It's possible that, you know, somebody could have told him that his body was dumped on the roadway and went to look for it and nobody could ever find it. What's inconsistent about that? What's inconsistent is I believe his 1994 declaration or earlier in the record he had stated he was going to produce the death certificate. He was going to produce the death certificate. Later at the hearing he says the body was never found. There's also inconsistency. But didn't he ultimately produce, didn't he produce some death certificate? He's produced, I believe it was his uncle's death certificate. His uncle's death certificate. And that had nothing to do or said nothing about the circumstances surrounding his uncle's death. So he offered to the government the statement that I will produce the death certificate. Later he gets to the hearing and talks about the body never being found. So that's an inconsistency there. There's also inconsistencies with these dates here with respect to when his brother was actually killed as well as his failure to reconcile when he joined the KM organization and when Orlando was allegedly arrested and when Orlando joined the KM. I think what's revealing in this case is the petitioner stated to the immigration judge with respect to this inconsistency between whether his brother Orlando was killed in 1992 or killed in 1986. He says, I don't know what the lawyer wrote down because he was talking to Bracamonte. I don't even pay attention to what the lawyer is doing in his papers here. He had the burden of proof going forward before the immigration judge and the Board of Immigration Appeals and in this court to be consistent in his story and to care about what stories he had told before. Now, with respect to this prejudice of that, the petitioner claims with respect to the immigration judge's statement, I think the immigration judge assumed that there had been an asylum hearing or, excuse me, an asylum interview before the asylum officer. But as part of that exchange at pages 97 through 98, the I.J. says, you swore in your asylum application and you made another swearing before an asylum officer. I think that's where the assumption is that there was an actual asylum hearing before the asylum officer. Evidently that never occurred, but the I.J. is still correct that he made a swearing or an oath in his asylum application. So there isn't an overarching prejudice to the immigration judge's hearing of this case. Immigration judges routinely go through cases where they know the case has been rejected, obviously, because the case is before them. So it obviously had been denied, rejected or not passed upon by the asylum officers. That's how the case got to the immigration judge. The immigration judge hears this case and listens to the testimony and actually says, I don't know what to believe here. There are so many inconsistencies and contradictions. I just don't know what to believe. And the board confirms that. The board said, well, no, they didn't actually confirm that. They just said no single concern would lead us to conclude that the Respondent's story is untrue. However, the constellation of problems described by the immigration judge leads us to agree. And I think that confirms the immigration judge's assessment. I don't know what to believe here. And whether the alien has the burden of proof going forward before the agency. I thought they had to point to specific, you know, what do you call it, cogent reasons for their adverse credibility. They do, but I think you look at the immigration judge. What do you do with the fact the board says, well, each one of those that he points to really, really doesn't cut it? Well, I think you marry up the immigration judge's decision and the board's decision, and they say the host of the problems with these, with this testimony and this evidence here points to material inconsistencies, and we're going to confirm and affirm the immigration judge's determination. And you'll see in the immigration judge's decision where the immigration judge just points to each of these inconsistencies that he finds in this case, and the board confirms that with its decision on appeal. Well, it raises an interesting legal issue. What if in this constellation of inconsistencies we were to determine that not all of them would even arise to an inconsistency? And since the board went with the constellation, can we take out some of the stars and still sustain the board, or would it have to be remanded? I think it would have to be remanded, to be honest with the Court. I think it would have to be remanded. I think each of those particular points in the constellation would have to be affirmed. And under this Court's law, we only have to have one that sustains the immigration judge. But if the Court finds that we can't hold up each of these stars in the constellation, I think under that scenario, candidly, I think you would have to remand the case. But that's not the situation here. You do have straightforward inconsistencies on the dates. And this isn't a matter of whether it was a Monday or Tuesday or the 19th or the 31st. These are years apart with respect to the dates. And in particular, you have this glaring inconsistency, I think, with respect to Orlando's death, the offering with respect to providing the death certificate and then later saying Orlando's body was never found, Your Honor. So we think the Court should affirm the board's decision and the immigration judge's case and deny the petition for review. If there's any other questions. Thank you. Thank you. There was a question about which death certificate. Could you put a minute on the clock, please? Sorry. Just a second. Thank you. Just a couple of things to respond to. Mr. Lackson did provide the death certificate of his brother, Nelson, who was killed three years after the application for asylum was first filed. To the question about whether it was prejudicial, this point of view that the judge had was mistaken about a prior asylum hearing at which the declaration had been reaffirmed. The judge himself said it was most important. So we don't need to search the record to find out whether it was a material mistake or not. The judge has said to himself that perhaps most importantly, you reaffirmed that declaration at your asylum hearing. And real quickly, on the question of constellation, I would like to quote this Court in a Lynn v. Gonzales case where the Court wrote, Aggregating the suspicions as a totality, to use the IJ's term, does not salvage the adverse credibility finding. Stacking one suspicion or conjecture on top of another simply extends but does not strengthen the flimsy house of cards. And then in closing, one word about the Catt claim. This Court's precedents are clear. The immigration judge may not allow an adverse credibility determination on the asylum claim to wash over the torture convention claim. Here we submitted plenty of separate evidence in the public source documents showing that goes specifically to the issue of torture, and torture being a – official torture still being used by the very groups that Mr. Lackson testified were targeting him in 2001, 2002, 2003. This evidence is located at tabs E, F, G, I, J, T, B, and EE. This is evidence about torture not considered, not – that would not be washed over by an adverse credibility determination on the asylum claim. Thank you. The case of Lackson v. Holder is submitted. And I also note, Mr. Kahn, that you are serving as pro bono attorney for Mr. Lackson, and the Court appreciates your service, and I know the government always appreciates having well-written briefs like those we receive. So thank both of counsel for your argument this morning.
judges: Reavley, McKeown, Paez